1
2
3
4
5                      **UNITED STATES DISTRICT COURT**
6                             **DISTRICT OF NEVADA**
7

| | |
|---|---|
| 8  UNITED STATES OF AMERICA,              ) | |
| 9                        Plaintiff,       ) | Case No.  2:06-cr-00379-LDG-GWF |
| 10 vs.                                     ) | **FINDINGS & RECOMMENDATIONS** |
| 11 ROBERT MYRON LATHAM,                    ) | |
| 12                       Defendant.        ) | |

14    This matter is before the Court on Defendant Robert Myron Latham's Motion to Dismiss for
15 Failing to Preserve Potentially Exculpatory Evidence (#116), filed on July 22, 2008 and the
16 Government's Response to Defendant's Motion to Dismiss (#118), filed on August 4, 2008.  The Court
17 conducted an evidentiary hearing in this matter on August 8, 2008.

18                            **FACTUAL BACKGROUND**

19    Defendant Robert Myron Latham is charged in a three count Indictment, filed on November 15,
20 2006, with transporting child pornography, receipt of child pornography and possession of child
21 pornography in violation of 18 U.S.C. § 2252A(a)(1) (2) and (5)(B).  The indictment arises out of
22 evidence that the Government seized during the search of a residence on June 1, 2005 pursuant to a
23 search warrant issued by United States Magistrate Judge Lawrence R. Leavitt.  The affidavit in support
24 of the search warrant stated that on February 25, 2005 a person using a computer with Internet Protocol
25 ("IP") address 68.224.236.152 downloaded images of child pornography from a child pornography
26 website through a "peer to peer" ("P2P") file sharing program known as "Limewire."  On the date that
27 the images were downloaded, IP address 68.224.236.152 was assigned to Larry Latham who resided at
28 6420 East Tropicana Avenue, Unit 164, Las Vegas, Nevada 89122.  Based on the affidavit, Magistrate

Judge Leavitt concluded that there was probable cause to believe that evidence of child pornography would be found on the premises located at 6420 East Tropicana Avenue, Unit 164, Las Vegas, Nevada 89122.  The search warrant authorized the Government to seize and search computers found on the premises for evidence of child pornography.  *See Findings & Recommendations and Order Denying Franks Hearing (#56)*, as adopted by the District Judge on December 18, 2007. *Order (#70)*.

Federal agents executed the search warrant on June 1, 2005 at which time they determined that the residence was occupied by Larry Latham, his brother, Defendant Robert Latham, and Sherryl Carroll, Larry Latham's wife.  The agents discovered three computers in the residence: an  "E-Machine" desktop computer, a generic desktop computer and a laptop computer.  For purposes of this motion, it is undisputed that the three computers used the same wireless router which permitted them to connect to the Internet through IP address 68.224.236.152.  The three computers were also connected to each other in a shared network.  The Government alleges that during the execution of the search warrant, Defendant Robert Latham agreed to speak with the FBI agents and told them that the laptop computer located in his bedroom belonged to him and that he was its sole user.  Defendant Latham allegedly admitted that he had the Limewire program loaded on his laptop computer and used it to download music and pictures of underage girls and that he saved the pictures that he liked in different folders on the laptop computer which were organized and labeled by the types of images.  Defendant also allegedly told the FBI agents that "he hid these folders in the Card Shop file on his computer so that someone else would not come across them accidently."  *Government's Response (#118)*, pp. 5-6.

The agents seized the two desk top computers found on the premises – the generic desktop computer and an "E-Machines" computer which belonged respectively to Larry Latham and Sherryl Carroll.  According to the Government, when its forensic examiner attempted to make a forensic image of "E-Machine" computer's hard drive, he determined that it was corrupted to such an extent that it could not be imaged.  The forensic examiner was able to make an image of the generic computer's hard drive and upon examination of that image no child pornography was found.  The Government returned these two computers to Larry Latham on June 13, 2005.  The agents also seized Defendant Robert Latham's laptop computer and a forensic examination of the image of that computer allegedly revealed over 600 images of child pornography which were saved in well-organized folders labeled by name and

category.  *Government's Response (#118)*, p. 6.

In support of his Motion to Dismiss, Defendant submitted an affidavit by Lawrence Edward Latham ("Larry Latham") who stated that the E-Machines computer and the generic computer were returned to him on June 13, 2005.  *Motion to Dismiss for Failing to Preserve Potentially Exculpatory Evidence (#116), Exhibit "B"*, ¶ 4.  Larry Latham stated that he attempted to use both computers that day and found that they were inoperable.  He stated that all data on the computers' hard drives had been destroyed and could no longer be retrieved.  *Id.*, ¶¶ 5, 6.  Mr. Latham stated that he later disposed of both computers because they had no value and could not be used in any way.  *Id.*, ¶ 7.  *See Government's Hearing Exhibit "1."*

Larry Latham testified at the evidentiary hearing on August 8, 2008 that at the time of the search, Robert Latham had been residing at that residence approximately a month or two.  On cross examination, he acknowledged that he may have told the FBI that Defendant had been residing at his residence since February 8, 2008, but did not recall specifically making such a statement.  Mr. Latham testified that Sherryl Carroll also resided at the residence.  He testified that in addition to himself, Sherryl Carroll and Defendant, one of Larry Latham's sons stayed at the residence from time to time and used the computers.  Mr. Latham also stated that visitors to the house would use the computers on occasion.  It appears from Mr. Latham's testimony that he referred to the use of his generic desktop computer and/or Ms. Carroll's "E-Machine" desktop computer.

Larry Latham testified that the three computers were connected by a cable modem and wireless router and were networked together to share resources, including sharing data between the three computers.  He stated that all three computers were operating "just fine" on the day they were seized by the Government.  He testified that he has worked with computers since 1978 and was involved in working with computers and computer systems during his previous employment.  He testified that the generic computer and Sherry Carroll's "E-Machine" computer were returned to him approximately a week or ten days after the search.  Mr. Latham testified that FBI Agent Gruninger, who returned the computers, told him that the computers were damaged.  He further testified that Agent Gruninger told him that the "E-Machine" computer was so damaged that he could not even image it.

. . .

Mr. Latham testified that after the generic desktop computer and "E-Machine" desktop computer were returned, he could not "boot" either of them. He was never able to start the "E-Machine" computer, or repair or fix it. Mr. Latham testified that he discarded the "E-Machine" computer within a couple of weeks after it was returned by the Government. The generic computer would not "boot," but he was able to reformat it with other hard drives and reinstall programs on it and thereafter used it for some undetermined time period. He stated, however, that he was not able to recover the data that had been stored on the hard drive at the time it was seized on June 1, 2005. He eventually replaced the generic computer because it was old and slow and because he needed a more updated computer. Mr. Latham testified that he could not determine how the computers were damaged.

Larry Latham testified that at the time he discarded the computers, no criminal charges had been filed against him or Defendant Robert Latham. He was not told by the Government or anyone else that he should preserve the computers. Mr. Latham testified that he cannot remember if he told the FBI that the generic computer was also damaged, although he contacted the FBI from time to time to find out if other items seized during the search were going to be returned.

Larry Latham testified that he set up the shared network for the three computers. He did not install secure passwords to access the computers or the shared network. He also testified that he left his generic computer on all the time. Thus, visitors to the house would be able to use the computers and access the shared network folder.[1] Mr. Latham testified that another person using the generic computer or "E-Machine" computer would only be able to access the common or shared folder located on Defendant's laptop computer. Mr. Latham testified that because of his computer knowledge or "savy," he would probably have been able to access nonshared folders on Defendant's laptop computer through his generic computer. He did not indicate, however, that he had ever did so. Mr. Latham testified that he used his brother's laptop computer from time to time to make sure it was working okay. Other than defragmenting his brother's computer or cleaning it up, Mr. Latham testified that to his knowledge

---

[1] During the hearing, the parties used the term "folder" to describe the locations on the computers where information was located. While the Court is unsure that the term "folder" is the correct technical term for the locations where information was stored on the computers, the Court follows the terminology used by the witnesses and counsel during the hearing.

1  Defendant was the only user of the laptop computer.

2  Mr. Latham testified that he did not download child pornography to his generic computer or place
3  child pornography on Defendant's laptop computer. He also testified that he seriously doubted that
4  Sherryl Carroll downloaded child pornography to the "E-Machine" computer, and he does not believe
5  she downloaded anything onto that computer. He testified that he was not aware of a folder called "Card
6  Shop" on Defendant's laptop computer and does not believe there was such a folder. He did not set up
7  "well organized folders" on Defendant's laptop computer that contained and categorized images of child
8  pornography which the Government alleges were found in the "Card Shop" folder located in the laptop
9  computer.

10  Defendant also submitted an affidavit by computer expert Adrian L. Mare. *Motion to Dismiss for*
11  *Failing to Preserve Potentially Exculpatory Evidence (#116), Exhibit "A."* Mr. Mare stated in his
12  affidavit that he examined the computer hard drive seized by the Government, i.e., the laptop computer's
13  hard drive. *Id.*, ¶ 3. He also stated that he examined photographs of Defendant's home supplied by the
14  Government which showed that the computers were connected together via a peer network and were also
15  connected to a wireless router. He stated that a peer network is unsecured and can be accessed by others.
16  *Id.*, ¶4. Mr. Mare examined the laptop computer hard drive seized by the Government and found that the
17  hard drive was shared. *Id.*, ¶ 5. He stated that in order to establish whether there were different users
18  accessing the three computers, it would be important for him to examine the hard drives of all connected
19  computers seized by the Government. *Id.*, ¶ 6.

20  Mr. Mare testified at the evidentiary hearing that he was retained by Defendant's previous
21  counsel, the Federal Public Defender, approximately two years ago.[2] After he was retained, Mr. Mare
22  determined that the three computers were connected to the same wireless router and peer network and
23  that there was a shared area on the three computers. Mr. Mare testified, however, that prior to May or
24  June of this year, he only asked to examine the laptop computer, even though he was aware of the
25  existence of the desktop computers and that the three computers were connected to each other by a

26  ─────────────

27  [2]The Court infers from Mr. Mare's testimony that he was retained after the Indictment was filed
    in November 2006. Therefore, Mr. Mare's involvement as Defendant's expert in this case is less than
28  two years.

common network at the time of the search.  He acknowledged that he had previously visited the FBI office to inspect the laptop computer, but did not request permission to inspect the other computers during those visits.  After Defendant's present counsel took over the case in May 2006,[3] Mr. Mare testified that he had a discussion with defense counsel and told him that he needed examine the two other computers that were connected to the laptop computer.  Mr. Mare states that he told Defendant's counsel that the computers were "mapped together" or networked together, and that by examining the other two computers he would be able to determine who else had access to the laptop computer and whether the other computers were sharing different files with the laptop.

   Mr. Mare testified that from his examination of the laptop computer, he knows that the other two computers had access to it.  He further testified that an examination of the other computer hard drives would allow him to determine dates and times that persons logged on and off those computers and what websites were accessed by the users of those computers.  He would also be able to determine how many persons used the computers and who the users were based on their profiles.  Mr. Mare testified that if the hard drives for the generic computer and "E-Machine" computer were available for examination, he would be able to determine from their hard drives whether data was transferred to those computers from another computer.  He testified that he cannot make this determination without examining the other computer hard drives.

   Mr. Mare also testified, however, that the user of the laptop computer could download data from the Internet to the laptop without the data going to the other two computers.  The data downloaded by the laptop computer user would go directly to the laptop computer and the laptop computer user could then transfer the data to the shared folders in the other two computers.

   Mr. Mare testified that to his knowledge when the Government performs a forensic examination of a computer, it normally makes a forensic image, or bit stream copy of the computer's original hard drive.  He stated that the Government will not turn the computer on until it makes the forensic image copy of the original hard drive.  Mr. Mare indicated that he recently asked about access to the images of

---

   [3]The Court Docket indicates that Mr. Jackson was appointed as Defendant Latham's counsel on May 6, 2008.  *See Minutes of Proceedings (#99).*

the two other computers. He did not testify what the Government's response was, although he apparently has not received access to a forensic image of the generic computer if it still exists.

Mr. Mare testified that in order for a user of one of the other computers to get into the shared area used by the three computers, the user would have to enter his user name and password in the shared folder. Mr. Mare testified that data located on one of the other two networked desktop computers could only be transferred from those computers into the designated shared folder on Defendant's laptop computer. Only Defendant, or another person using the laptop computer, however, could transfer data from the shared folder into one of the non-shared folders on the laptop computer. Mr. Mare testified that he could determine from Defendant's laptop computer when Defendant logged on and off that computer and when he accessed particular Internet websites and how often.

Mr. Mare also acknowledged that the laptop computer contains many child pornography images which are contained in well organized folders which have names regarding the type of images contained in the folder. Based on his examination of the laptop computer, there is no evidence that anyone other than Defendant put the child pornographic images on that computer. Mr. Mare testified that the well organized folders containing images of child pornography in the laptop computer are located in the "Card Shop" folder which is not a shared folder with other computers. He testified that those folders would have been created by Defendant or a person using the laptop computer. Mr. Mare testified that he has not examined the laptop computer to determine if it is secured.

## DISCUSSION

Defendant argues that the Court should dismiss the Indictment in this case because the Government failed to preserve potentially exculpatory evidence – the "E-Machine" desktop computer and Larry Latham's generic desktop computer or the forensic image of the hard drive of that computer. Defendant argues that if the hard drives of those computers had been preserved, his computer expert, Mr. Mare, would have been able to determine through forensic examination whether (1) a computer had been tampered with; (2) whether someone may have hacked into the desktop computers; or (3) whether illegal data similar to that found on Defendant's computer was also on the desktop computers. Defendant states that this would establish that whoever had access to the desktop computers may have been responsible for the illegal images found on Defendant's computer. *Motion to Dismiss (#116)*, pp. 2-3.

In *California v. Trombetta*, 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984), the Supreme Court reversed a California court of appeals decision which held that Intoxilyzer test results were not admissible in drunk driving prosecutions because the state had not preserved breath samples which could be independently tested by defendants' experts to determine if their blood-alcohol content exceeded the legal limit at the time the Intoxilyzer tests were performed.  The Supreme Court stated that under the Due Process Clause, criminal prosecutions must comport with prevailing notions of fundamental fairness.  The Court noted that it had long interpreted this standard of fairness to require that criminal defendants be afforded a meaningful opportunity to present a complete defense, and that to safeguard that right, the Court had developed "what might loosely be called the area of constitutionally guaranteed access to evidence." *Trombetta*, 104 S.Ct. at 2532, quoting *United States v. Valenzuela-Bernal*, 458 U.S. 858, 867, 102 S.Ct. 3440, 3447, 73 L.Ed.2d 1193 (1982).  While this standard had been applied in other contexts, the Court noted that it had never squarely addressed the government's duty to take affirmative steps to preserve evidence on behalf of criminal defendants.  The Court stated:

> Whenever potentially exculpatory evidence is permanently lost, courts face the treacherous task of divining the import of materials whose contents are unknown and, very often, disputed. (citation omitted). Moreover fashioning remedies for the illegal destruction of evidence can pose troubling choices.  In nondisclosure cases, a court can grant the defendant a new trial at which the previously suppressed evidence may be introduced.  But where evidence has been destroyed in violation of the Constitution, the court must choose between barring further prosecution or suppressing – as the California Court of Appeals did in this case – the state's most probative evidence.

*Trombetta*, 104 S.Ct. at 2533.

In reversing the decision suppressing the Intoxilyzer test results, *Trombetta* noted that the California authorities did not destroy respondents' breath results in a calculated effort to circumvent the disclosure requirements established by *Brady v. Maryland* and its progeny.  The court also accepted that the officers were acting in good faith and in accord with their normal practice and that the record contained no allegation of official animus toward the defendants or a conscious effort to suppress exculpatory evidence.  The Court further stated:

> More importantly, California's policy of not preserving breath samples is without constitutional defect.  Whatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence

> which might be expected to play a significant role in the suspect's defense. To meet this standard of constitutional materiality, see *United States v. Agurs*, 427 U.S., at 109-110, 96 S.Ct., at 2400, evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means. Neither of these conditions is met on the facts of this case.

*Id.,* 104 S.Ct. at 2534.

*Trombetta* went on to hold that the accuracy of the Intoxilyer had been reviewed and certified by the California Department of Health and test procedures had been implemented to ensure that the Intoxilyer tests were performed properly before the test results were admissible in evidence. Thus, the chances were extremely low that preserved breath samples would have been exculpatory. The Court concluded that it was much more likely that preserved breath samples would be inculpatory rather than exculpatory. Secondly, the Court stated that defendants had other reasonably available means to present their defense by raising issues regarding the alleged reliability of the Intoxilyer test or through cross-examination of the law enforcement officers who administered the tests in an attempt to raise doubts whether the tests were properly performed.

In *Arizona v. Youngblood*, 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988), the defendant was convicted of child molestation, sexual assault and kidnaping. The defendant's conviction was based in part on the victim's eyewitness identification of the defendant as the perpetrator. The state was allegedly negligent in failing to properly preserve semen and blood samples found on the victim's clothing which could have been tested to determine whether they matched the defendant's blood or semen type. The tests performed by the state on the samples after they had deteriorated were inconclusive. Although the samples were made available to the defendant's expert for testing, he declined to conduct tests on those samples. The Arizona Court of Appeals reversed the defendant's conviction based on the expert testimony at trial that timely performance of tests with properly preserved samples could have produced results which might have completely exonerated the defendant. In reversing and reinstating defendant's conviction, the Supreme Court held that in addition to the two requirements of *Trombetta*, that defendant show that the evidence possessed an exculpatory value that was apparent before the evidence was destroyed and that the defendant would be unable to obtain comparable evidence by other reasonably available means, defendant was also required to show that the

state's failure to preserve the evidence was done in bad faith. *Id.*, 109 S.Ct. at 337. The Court stated that the failure of the police to refrigerate the clothing and to perform timely tests on the semen samples was negligent at worst. The Court also noted that defendant had not shown that the police knew the semen samples would have exculpated defendant when they failed to perform certain tests or to preserve the victim's clothing by refrigerating it. *Id.*, 109 S.Ct. at 336-37.

Based on *Trombetta* and *Youngblood,* the Ninth Circuit held in *United States v. Cooper*, 983 F.2d 928, 931 (9th Cir. 1993), that in order to establish a Constitutional Due Process violation based on the government's failure to preserve evidence, the defendant must show (1) that the unavailable evidence possessed exculpatory value that was apparent before the evidence was destroyed; (2) that defendant was unable to obtain comparable evidence by other reasonably available means; and (3) that the government acted in bad faith in failing to preserve the evidence. In *Cooper*, the government charged the defendants with operating an illegal methamphetamine laboratory. The defendants maintained that they operated a legitimate lab that made legal chemical products such as a fuel additive and naval jelly. Prior to indictment, the government seized a reaction vessel and other equipment that was allegedly used to make methamphetamine. The defendants' attorney requested that the government return the vessel which was used in defendant's legal manufacturing process and further informed the DEA agent that the reaction vessel was critically engineered to make dextran sulfate and could not withstand the high temperatures required to make methamphetamine. Even though the DEA agent knew that the vessel would be destroyed pursuant to DEA policies for disposing of hazardous materials, the agent told defendants' attorney that the vessel was being held as evidence. The agent, however, took no steps to preserve the vessel for evidence or inspection and it was buried in a toxic waste dump by the government's contractor. After the vessel was discarded, the defendant's counsel wrote to the Assistant United States Attorney ("AUSA") in charge of the case, expressing his hope that the government had completed its analysis of the vessel and again requested that it be returned. The AUSA responded by stating that vessel was being held as evidence.

Applying the foregoing requirements*, Cooper* affirmed the district court's dismissal of the indictment. First, the Ninth Circuit found that the government was on notice that the reaction vessel possessed exculpatory value before it was destroyed based on the information provided by the

1  defendants' counsel that the vessel was used in a legal manufacturing process and that as modified and
2  configured could not withstand the high temperatures required to manufacture methamphetamine.
3  Second, the court held that absent the ability to have their expert examine the vessel in the condition it
4  existed at the time defendants acquired and used it, defendants did not have the ability to present a
5  complete defense and there was no other reasonably available evidence that would be comparable to the
6  destroyed equipment and an expert's evaluation whether it could have been used to make
7  methamphetamine. Finally, the court held that the government's failure to take steps to preserve the
8  evidence after being notified by the defendants of its alleged exculpatory nature and in misrepresenting
9  that the equipment was being held as evidence established the government's bad faith.

10  In this case, Defendant has presented evidence through the testimony of Defendant's brother
11  Larry Latham and Defendant's computer expert Adrian Mare that the three computers used the same
12  modem and wireless router to connect to the Internet and that the three computers were networked
13  together to permit the users of the computers to share data in a common or shared folder. Mr. Mare
14  testified that if the hard drives on the two desktop computers were available for examination, he could
15  determine who used those computers and when they were used. Although not clear from his testimony,
16  the inference is that by examining the hard drives on the two desktop computers he would be able to
17  determine if someone used those computers to connect to a child pornography website and download
18  images of child pornography.

19  Mr. Mare's testimony indicates that a user of the other computers would generally have only been
20  able to download or transfer data to the shared folder on Defendant's laptop computer. Mr. Mare
21  testified, however, that he has examined Defendant Latham's laptop computer and that the images of
22  child pornography on that computer are not located in the shared or networked folder. Instead, the
23  images are located in the "Card Shop" folder in the laptop computer, in well organized and labeled
24  folders or files. The "Card Shop" folder, and the folders or files therein, are not shared folders that users
25  of the two desktop computers would have been able to access. Mr. Mare also testified that he can
26  determine from the laptop computer when Defendant or someone using his identifying information
27  accessed the Internet.
28  . . .

1    Defendant would have a more credible argument that the Government had a duty to preserve the
2    generic computer and the "E-Machine" computer (assuming that the hard drive on that computer could
3    have been examined) if the alleged images of child pornography had been discovered in the shared
4    network folder used by the three computers.  As Defendant's own expert testified, however, the alleged
5    images of child pornography on the laptop computer are located in well organized folders or files located
6    in a non-shared program or folder.  Defendant presented no testimony or evidence indicating that
7    someone "hacked" into the laptop computer and placed images of child pornography in the non-shared
8    program or folder.  Nor has Defendant shown that if such "hacking" occurred, it could not be determined
9    though examination of the laptop computer, but could be determined through inspection of the other two
10   computers.

## CONCLUSION

12   Defendant has therefore failed to make the requisite showing under *Trombetta, Youngblood* and
13   *Cooper* that unavailable evidence possessed exculpatory value that was apparent before the evidence was
14   destroyed and that defendant is unable to obtain comparable evidence by other reasonably available
15   means.  The lack of exculpatory value regarding the two other computers is also circumstantially
16   supported by the fact that Defendant's expert did not request that the desktop computers be made
17   available for his examination until May or June of this year.  The evidence presented by the Defendant's
18   witnesses also does not support an inference that the Government acted in bad faith in not preserving the
19   desktop computers.  Accordingly,

## RECOMMENDATION

21   **IT IS RECOMMENDED** that Defendant Robert Myron Latham's Motion to Dismiss for Failing
22   to Preserve Potentially Exculpatory Evidence (#116) be **denied.**

## NOTICE

24   Pursuant to Local Rule IB 3-2, any objection to this Finding and Recommendation must be in
25   writing and filed with the Clerk of the Court within ten (10) days.  The Supreme Court has held that the
26   courts of appeal may determine that an appeal has been waived due to the failure to file objections within
27   the specified time.  *Thomas v. Arn*, 474 U.S. 140, 142 (1985).  This circuit has also held that (1) failure
28   to file objections within the specified time and (2) failure to properly address and brief the objectionable

issues waives the right to appeal the District Court's order and/or appeal factual issues from the order of the District Court.  *Martinez v. Ylst,* 951 F.2d 1153, 1157 (9th Cir. 1991); *Britt v. Simi Valley United Sch. Dist.*, 708 F.2d 452, 454 (9th Cir. 1983).

DATED this 14th day of August, 2008.

_____
GEORGE FOLEY, JR.
United States Magistrate Judge